UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

MARICHU SUAREZ BAOANAN,      :
                             :
          Plaintiff,         :
                             :          **ECF CASE**
     v.                      :
                             :          08 Civ. 5692 (VM)
LAURO LIBOON BAJA, JR., NORMA :
CASTRO BAJA, MARIA ELIZABETH BAJA :
FACUNDO, and LABAIRE INTERNATIONAL :
TRAVEL, INC.                 :
                             :
          Defendants.        :

-------------------------------------------------------- x

## STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA

LEV L. DASSIN
Acting United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel: (212) 637-2729
Fax: (212) 637-2717
E-mail: emily.daughtry@usdoj.gov

EMILY E. DAUGHTRY
Assistant United States Attorney
– Of Counsel –

**PRELIMINARY STATEMENT**

Pursuant to 28 U.S.C. § 517[1] and at the invitation of the Court, the United States of America ("United States" or "Government"), by and through the undersigned counsel, respectfully submits this Statement of Interest setting forth the Government's views on the issues of diplomatic immunity implicated in this case.

This action was brought against a Philippine diplomat, the former Permanent Representative of the Philippines to the United Nations, Ambassador Lauro Liboon Baja, Jr. ("Ambassador Baja"), his wife Norma Castro Baja ("Mrs. Baja"), their adult daughter, and a Philippine employment and travel agency, by the Bajas' former domestic servant, Marichu Suarez Baoanan ("plaintiff"), alleging, *inter alia*, that defendants violated various laws against forced labor, human trafficking, and involuntary servitude.  Ambassador Baja served as the Permanent Representative of the Philippines to the United Nations from May 11, 2003, to February 21, 2007.  *See* Defendants [sic] Reply to Plaintifff's [sic] Memorandum of Law in Support of Diplomatic Immunity, dated October 30, 2008 ("Defendants' Reply Brief"), Exhibit A.  The complaint was filed in June 2008, and served on defendants in the Philippines in July 2008, more than a year after Ambassador Baja had left his post at the United Nations.[2]

---

[1]  28 U.S.C. § 517 provides that "any officer of the Department of Justice[] may be sent by the Attorney General to any State or district in the United States to attend to the interest of the United States in a suit pending in a court of the United States."

[2]  The docket indicates that Ambassador and Mrs. Baja were served in the Philippines on July 8, 2008.  *See* Docket Nos. 2-5.  Additionally, the parties signed a stipulation in which they agreed that New York-based counsel for defendants "shall accept service for defendants Lauro Liboon Baja, Jr., Norma Castro Baja and Labaire International Travel, Inc., if still unserved." *See* Stipulation, dated July 11, 2008, at Docket No. 7.  There does not appear to be any dispute that Ambassador and Mrs. Baja were served after they had returned to the Philippines, when Ambassador Baja was no longer serving as a diplomat at the United Nations.  *See* Defendants'

In response to the Court's Order, dated September 22, 2008, the parties submitted briefs in support of and in opposition to the Court's exercise of jurisdiction over Ambassador and Mrs. Baja, in light of the Bajas' invocation of diplomatic immunity pursuant to the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, T.I.A.S. 7502, 500 U.N.T.S. 95 ("Vienna Convention" or "VCDR").  In their briefs, the parties focused on whether plaintiff's claims fell under the commercial activity exception to immunity set forth in Article 31(1)(c) of the VCDR, which states that an accredited diplomat "shall . . . enjoy immunity from [the receiving State's] civil and administrative jurisdiction, except in case of . . .(c) an action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions."

However, because Ambassador and Mrs. Baja were served in this action more than a year after they had left the United States, and when Ambassador Baja was no longer the Permanent Representative of the Government of the Philippines to the United Nations, the Government's view is that the Court should consider the question of whether Ambassador and Mrs. Baja enjoy *residual* diplomatic immunity under Article 39(2) of the VCDR from any or all of plaintiff's claims.  In this Statement of Interest, the Government sets forth its position on the scope of residual diplomatic immunity under Article 39(2) of the VCDR, which is limited to "acts performed by [a diplomat] in the exercise of his functions as a member of the mission," often referred to as "official acts" immunity.  VCDR, Article 39 (2).  Because Mrs. Baja, as the spouse of a former diplomat, was never a member of the Philippine Mission to the United Nations, the

---

Reply Brief, Ex. A.

Government takes the position that she does not enjoy residual diplomatic immunity.  The

Government does not take a position, however, on the applicability of such immunity to

Ambassador Baja in this case.

  In addition, this Statement of Interest clarifies the Government's position with respect to

the relationship between the "commercial activity" exception to the immunity of accredited

diplomats set forth in Article 31(1)(c) and the residual immunity enjoyed by former diplomats, as

set forth in Article 39(2) of the VCDR, highlighting the separate legal questions raised by these

two articles.  The commercial activity exception in Article 31(1)(c) is a limited and narrow

provision, and acts outside the scope of this exception are not necessarily "official" acts for

which a diplomat enjoys immunity in perpetuity.  In fact, there is a broad scope of a diplomat's

conduct that is neither "commercial" nor "official," for which former diplomats do not enjoy

residual immunity.

  The United States has important interests in the proper interpretation and application of

the VCDR.  The Government submits the following views to ensure that the United States

fulfills its treaty obligations as a receiving state, and to protect its right as a sending state with

regard to its diplomats and missions abroad.

**ARGUMENT**

**I.     SCOPE OF RESIDUAL IMMUNITY**

**A.     The Residual Immunity Enjoyed by Former Diplomats Is Limited to Immunity for Acts Performed in the Exercise of Official Functions as a Mission Member**

The privileges and immunities accorded diplomatic agents are set forth in the VCDR. Under the VCDR, during the period of their accreditation, diplomatic agents enjoy near absolute immunity from civil jurisdiction.  *See* VCDR, Article 31.  The purpose of such diplomatic immunity "is not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing States."  *Id.*, preamble, cl. 4; *see also Swarna v. Al-Awadi*, 06 Civ. 4880 (PKC), 2009 WL 773446, at * 6 (March 20, 2009 S.D.N.Y.); *U.S. v. Cole*, 717 F.Supp. 309 (E.D.Pa. 1989) ("The theoretical basis for diplomatic immunity is generally agreed to be 'functional necessity.'").  The Department of State has further elaborated that, "foreign representatives may carry out their duties effectively only if they are accorded a certain degree of insulation from the application of the laws of the host country.  Thus, these representatives need protection *while* they are serving in their positions so that they may fully carry out their functions, without fear of interference or harassment by the receiving state."  Declaration of Abraham D. Sofaer, dated July 5, 1988 ("Sofaer Decl."), ¶ 6, submitted in *United States v. Guinand*, 688 F.Supp. 774 (D.D.C. 1988), declaration excerpted in *Cumulative Digest of United States Practice in International Law*, 1981 - 1988, Book I (1993) at 1010 - 1013.[3]

---

[3] For the convenience of the Court and the parties, copies of the relevant pages of this publication will be provided under separate cover.

Once an individual *ceases* to be a diplomatic agent in a receiving state, however, the scope of that individual's immunity is then limited to that set forth in Article 39 (2):

> When the functions of a person enjoying privileges and immunities have come to an end, such privileges and immunities shall normally cease at the moment when he leaves the country, or on expiry of a reasonable period in which to do so, but shall subsist until that time, even in case of armed conflict.  However, *with respect to acts performed by such a person in the exercise of his functions as a member of the mission, immunity shall continue to subsist.*

VCDR, Article 39(2) (emphasis added).  In other words, a former diplomat has continuing or residual immunity only for "acts performed . . . in the exercise of his functions as a member of the mission," *i.e.,* for his official acts.[4]  VCDR, Article 39(2)*; see also Swarna,* 2009 WL 773446, at *5, *Brzak v. United Nations*, 551 F. Supp.2d 313, 317 (S.D.N.Y. 2008); *De Luca v. United Nations Organization*, 841 F.Supp. 531, 534 (S.D.N.Y. 1994).  Residual immunity is limited to official acts performed by a diplomat as part of his job because, as explained by a leading diplomatic law expert, such acts "are in law the acts of the sending State.  It has therefore always been the case that the diplomat cannot be sued in respect of such acts since this would be indirectly to implead the sending State."  Eileen Denza, *Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations* 439 (3d ed. 2008).[5]  The need for the more expansive immunity enjoyed by accredited diplomats "terminates when the individual ceases to be a diplomatic agent."  *Swarna*, 2009 WL 773446, at *6; *see also* Sofaer Decl., ¶ 6 (explaining

---

[4]  In this brief, the Government uses the term "official acts" to refer only to the scope of residual immunity provided by Article 39(2) of the VCDR.  The Government takes no position on the scope of the term "official acts" as used elsewhere in the VCDR.

[5]  For the convenience of the Court and the parties, copies of the relevant pages of this publication will be provided under separate cover.

that former diplomats "are no longer exercising important functions which must be protected in order to maintain the orderly conduct of foreign relations between their state and the receiving state").  Thus:

> [t]he United States Government has consistently interpreted Article 39 of the VCDR to permit the exercise of U.S. jurisdiction over persons whose status as members of the diplomatic mission has been terminated for acts they committed during the period in which they enjoyed privileges and immunities, except for acts performed in the exercise of the functions as a member of the mission. (Article 3 of the VCDR lists the permissible functions of a diplomatic mission.) The Department of State has publicly communicated this interpretation to U.S. law enforcement authorities, to Congress, and to members of foreign diplomatic missions in the United States.

Sofaer Decl., ¶ 5.

The Department of State issued such a communication to the chiefs of all diplomatic missions in the United States in a Circular Note, which stated, "[t]he Department wishes to remind the missions that in any case involving criminal activity no immunity exists against the arrest and prosecution of a person formerly entitled to privileges and immunities who returns to the United States following the termination of his or her official duties, unless it can be proved that the crime *related to the exercise of official functions*." Circular Note, November 15, 1989, published at 2 Foreign Affairs Manual Exhibit 233.4 (emphasis added), *available at* http://www.state.gov/documents/organization/84395.pdf.  Although this communication was focused on criminal immunity, the limited immunity of former diplomats described in Article 39 (2) applies equally to both criminal and civil liability. *Swarna*, 2009 WL 773446, at *9. Furthermore, "[t]he United States Government's interpretation of the termination of immunity

under the VCDR is . . . consistent with the practice of the other sovereign states, including [those] which are party to the Vienna Convention."  Sofaer Decl., ¶ 8.

**B.      The Court Should Consider Whether Ambassador Baja's and/or His Wife's Employment of Plaintiff Was an Official Act to Determine Whether He and/or She Enjoy Residual Immunity From This Suit.**

In this case, because Ambassador Baja was served in this action more than a year after he left his position as Permanent Representative to the United Nations, Ambassador Baja enjoys residual immunity only for his official acts carried out as a member of the Philippine Mission to the United Nations under Article 39 (2) of the VCDR.[6]  During the period when Mrs. Baja was accredited by the Government of the Philippines to the United Nations as the Ambassador's spouse, she enjoyed the same broad privileges and immunities as Ambassador Baja.  *See* VCDR, Article 37(1).  However, Mrs. Baja was also served in this action long after Ambassador Baja left his post at the United Nations.  As she was never a member of the Philippine Mission to the United Nations, she could not have conducted any acts under Article 39(2) "as a member of the mission," and her immunity does not continue to subsist for any acts.  Thus, Mrs. Baja enjoys no residual immunity and is subject to the civil jurisdiction of the United States. *See* VCDR, Article 37(1), 39(2).  *Cf. Swarna*, 2009 WL 773446, at *10-11.

---

[6]  The privileges and immunities set forth in the VCDR are enjoyed by Ambassador Baja and his wife by virtue of the Agreement Between the United Nations and the United States Regarding the Headquarters of the United Nations ("UN Headquarters Agreement"), which provides that certain resident representatives to the United Nations are entitled to the same privileges and immunities in the United States as the United States accords to diplomatic envoys accredited to it.  *See* UN Headquarters Agreement, Article V, § 15, 12 Bevans 956, T.I.A.S. 1676; *Ahmed v. Hoque*, No. 01 Civ. 7224 (DLC), 2002 WL 1964806, at * 5 (S.D.N.Y Aug. 23, 2002).

The question remaining before the Court is thus whether Ambassador Baja's employment of plaintiff was an act carried out in the exercise of his official functions as a member of the Philippine Mission.  It is clear that such acts are limited to those, "performed on behalf of or imputable to the sending State." Denza at 441.  The more difficult question is what constitutes such an act.  A similar question arises in the consular context, as consular officers and employees are not subject to criminal or civil jurisdiction "in respect of acts performed in the exercise of consular functions."  Vienna Convention on Consular Relations, Article 43(1), Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261 ("VCCR").  *See Ford v. Clement*, 834 F. Supp. 72, 75 (S.D.N.Y. 1993) ("[A] consular officer . . . must . . . plead and prove immunity on the ground that the act or omission underlying the process was in the performance of his official functions," *quoting Koeppel & Koeppel v. Federal Republic of Nigeria*, 704 F. Supp. 521, 522 (S.D.N.Y. 1989)).  In evaluating whether a specific act was "performed in the exercise of consular functions," rendering a consular officer or employee immune from jurisdiction, courts have looked to Article 5 of the VCCR, which describes activities that comprise consular functions.  *See, e.g., Park v. Shin*, 313 F.3d 1138 (9th Cir. 2002); *Gerritsen v. Consulado General de Mexico*, 989 F.2d 340 (9th Cir. 1993); *Ford,* 834 F. Supp. at 75 (S.D.N.Y. 1993);  *Cole*, 717 F. Supp. at 323.

It would be reasonable for courts to look to the analogous article of the VCDR, Article 3, which provides a list of the "functions of a diplomatic mission," to inform an analysis of whether an act was performed in the exercise of a former diplomat's "functions as a member of the mission."  Article 3 defines these as, inter alia,

> (a)   Representing the sending State in the receiving State;
> (b)   Protecting in the receiving State the interests of the sending State and of its nationals, within the limits permitted by international law;

(c)     Negotiating with the Government of the receiving State;
(d)     Ascertaining by all lawful means conditions and developments in the receiving State, and reporting thereon to the Government of the sending State;
(e)     Promoting friendly relations between the sending State and the receiving State, and developing their economic, cultural and scientific relations;

In the recent opinion in the *Swarna* case, the court correctly approached this question by conducting a careful analysis of the VCDR, including Article 3, and the existing case law in an attempt to discern the contours of residual diplomatic immunity.   The *Swarna* court concluded that residual immunity pertains to acts taken in the regular course of implementing an official program or policy of the mission, *see Swarna*, 2009 WL 773446, at *6 (*citing De Luca*, 841 F. Supp. at 534-35), as well as the hiring and employment of an individual to work at a diplomatic mission, *see id.* At * 7 (*citing Brzak* 551 F.Supp.2d at 319; *Osman v. Annan*, 07-837-CV-W (NKL), 2008 WL 2477535, at *1-2 (W.D. Mo. June 16, 2008); *D'Cruz v. Annan*, 05 Civ. 8918 (DC), 2005 WL 3527153, at *1 (S.D.N.Y. Dec. 22, 2005)).

The *Swarna* court also noted that "residual diplomatic immunity does not extend to lawsuits based on actions that were entirely peripheral to the diplomatic agent's official duties," such as, for example, the criminal distribution of narcotics, *see Swarna,* 2009 WL 773446, at *7 *(citing U.S. v. Guinard*, 688 F. Supp. 774, 774 (D.D.C. 1988)), and observed that the one case that "arguably holds to the contrary" did not independently analyze whether residual diplomatic immunity applied to defendant's acts because plaintiff had already conceded that defendant had been acting in his official capacity.  *See Swarna*, 2009 WL 773446, at *8 (discussing *Knab v. Republic of Georgia*, 97 Civ. 3118 (TFH), 1998 WL 34067108 (D.D.C. May 29, 1998).) Ultimately, the *Swarna* court determined that the acts alleged by a former domestic servant in

9

her complaint against former Kuwaiti diplomats were not official but private acts and thus that the former diplomats were not shielded by the residual immunity set forth in Article 39(2).  *See Swarna*, 2009 WL 773446, at *9, 10.  While the Government takes no position in this case as to whether Ambassador Baja enjoys residual immunity, the Government agrees with the analytical approach of the *Swarna* court, which came to its determination by considering, "whether the acts allegedly committed by [defendant] against plaintiff were performed in the exercise of his diplomatic functions."  *Id.* at *5.

## II.   RELATIONSHIP BETWEEN THE "COMMERCIAL ACTIVITY" EXCEPTION AND OFFICIAL ACTS IN THE VCDR

### A.   Residual Official Acts Immunity Under Article 39(2) of the VCDR Requires a Separate Analysis from the Commercial Activity Exception Under Article 31(1)(c) of the VCDR

In the Government's view, the question currently before the Court is whether the former Ambassador and his wife enjoy residual diplomatic immunity under Article 39(2) for the acts alleged by plaintiff.  Accordingly, there is no need for the Court to address whether the plaintiff's claims fall within the "commercial activity" exception of Article 31(1)(c) of the VCDR, which is applicable only to diplomatic agents during the period of their assignment and accreditation.

As noted above, the VCDR provides accredited diplomatic agents, as well as members of their families forming part of their households, near absolute immunity from civil jurisdiction. *See* VCDR, Articles 31, 37.  Article 31 provides three limited exceptions to this immunity, including an exception for "an action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official function."  VCDR,

Article 31(1)(c).  The scope of this exception has been ruled on in three cases outside this

district, all of which were brought against diplomats by their former domestic servants; in all of

these cases the courts agreed with the United States' position that the "commercial activities

exception" to Article 31(1)(c) does not apply to the employment of a domestic worker.  *See*

*Sabbithi v. Al Saleh*, No. 07-CV-00115-EGS, 2009 WL 737006, at * 4-5 (D.D.C. Mar. 20, 2009);

*Gonzalez Paredes v. Vila*, 479 F.Supp. 2d 187, 193 (D.D.C. 2007); *Tabion v. Mufti*, 877 F.Supp.

285, 291-292 (E.D.Va,. 1995), *aff'd*, 73 F.3d 535 (4th Cir. 1996).  An analysis of the application

of Article 31(1)(c)'s commercial exception with respect to accredited diplomatic agents,

however, is independent from the analysis applicable here, regarding the residual immunity of

Ambassador Baja under Article 39(2).  While Article 31(1)(c) provides an exception to

diplomatic immunity for commercial activity conducted "outside [a diplomat's] official

function," it does not follow that those acts of an accredited diplomat that do not fall within the

commercial activity exception are "official acts" for the purposes of residual immunity under

Article 39(2).  In fact, there is a broad scope of conduct that is neither commercial nor official,

for which former diplomats do not enjoy immunity.

In its recent Statement of Interest submitted in the *Sabbithi* case, the United States

explained that, consistent with both the origins and purpose of diplomatic immunity, and

confirmed by the Vienna Convention's negotiating history, "the term 'commercial activity' [in

Article 31(1)(c)] did not encompass the usual procurement of goods and services needed in the

diplomat's daily life, but rather focused on activities that were *normally inconsistent with* a

diplomat's position."  *See* Statement of Interest of the United States of America, dated July 22,

2008 ("*Sabbithi* SOI"), at 11 (emphasis added), *Sabbithi*, 2009 WL 737006 (Docket No. 48, July

11

22, 2008).  The *Sabbithi* court agreed with the United States, as well as with holdings in both *Tabion* and *Gonzalez Paredes*, that "hiring domestic employees is an activity incidental to the daily life of a diplomat and his or her family, and does not constitute commercial activity outside a diplomat's official function." *Sabbithi*, 2009 WL 737006, at * 5.[7]

However, in *Sabbithi*, the United States specifically declined to address whether the defendants enjoyed residual immunity under Article 39(2) of the VCDR, *see Sabbithi* SOI, n. 3, noting that it was not necessary given that defendants were accredited diplomats at the time of service of process.  Although the *Sabbithi* court correctly held that defendants were immune from suit as accredited diplomats, the court also briefly addressed the issue of residual immunity, holding that defendants' immunity remained intact under Article 39(2) of the VCDR after they left their diplomatic posts in the United States, because "defendants' conduct in employing plaintiffs was not performed outside the exercise of defendants' diplomatic functions."  *Sabbithi*, 2009 WL 737006, at * 3, 6.  It appears that the court's reasoning for its holding on residual immunity was premised on the belief that if the hiring of domestic employees is not a commercial activity under Article 31(1)(c), it follows that it must be an official act and therefore merits the residual immunity provided under Article 39(2).  *See id.*  The United States respectfully disagrees with this analysis.

_____

[7]  Diplomats are prohibited from engaging in commercial or professional activity.  *See* VCDR, Article 42 ("A diplomatic agent shall not in the receiving State practice for personal profit any professional or commercial activity.")  The drafters of the VCDR debated whether to include the commercial activity exception to immunity and retained it in part because of its applicability to dependents of diplomats who enjoy diplomatic immunity pursuant to Article 37(1) but may be allowed to engage in professional or commercial activities.  Such individuals should not enjoy immunity from civil or administrative jurisdiction for actions relating to those activities.  *See Sabbithi* SOI at 8; Denza at 305.

As set forth in Part I, *supra*, the immunity of current diplomatic agents is extensive, consistent with the purpose of such immunity "to ensure the efficient performance of the functions of diplomatic missions."  VCDR, preamble, cl. 4.  The exception to such immunity for commercial or professional activities set forth in Article 31(1), when examined in this context, should be interpreted narrowly.  *See* VCDR, Article 31(1); *see also Sabbithi,* 2009 WL 737006, at * 4, *Gonzalez Paredes,* 479 F.Supp. 2d at 193, *Tabion,* 877 F.Supp. at 291.  Residual immunity, however, is limited to acts "performed on behalf of or imputable to the sending State," Denza at 441.  It is not the case that all acts of a diplomatic agent, other than those for which there is an exception to immunity under Article 31, are "performed on behalf of or imputable to the sending State."  The types of conduct that clearly fall outside the scope of the commercial activities exception are "[o]rdinary contracts incidental to life in the receiving State, such as purchase of goods, medical, legal or educational services, or agreements to rent accommodation."  Denza at 305.  But it is precisely this type of unofficial conduct, which is incidental to the life of a diplomat and therefore protected by the broad immunity provided under Article 31, that would appear to fall outside the scope of the official acts "imputable to the sending State" for which Article 39(2) provides residual immunity.

Indeed, to conflate conduct that is not commercial, and thus outside the scope of Article 31(1)(c), with acts performed in the exercise of a diplomat's function as a member of the mission for which there is ongoing immunity under Article 39(2), would provide former diplomats with essentially the same broad immunity enjoyed by accredited diplomats.  As noted by the *Swarna* court, such conflation,

would eliminate any difference between the scope of immunity provided by Art. 31 and that provided by Art. 39, despite the use of more restrictive language in Art. 39. . . . Art. 39 first provides that a diplomatic agent's immunity "shall normally cease" when his duties "come to an end" and he departs the country or after a reasonable time to depart has expired.  VCDR [A]rt. 39(2).  The next sentence qualifies the prior one: "However, with respect to acts performed by such a person in the exercise of his functions as a member of the mission, immunity shall continue to subsist."  *Id.*  This qualifier makes clear that diplomatic agents were only intended to receive residual immunity with respect to official acts, and that not *all* acts of a diplomatic agent were understood to be official.

*Swarna*, 2009 WL 773446, at *10.  Thus, the Government's view is that even if a diplomat's conduct is determined to fall outside the commercial activity exception of Article 31(1)(c), as set forth in Part I, *supra*, a court must conduct a separate analysis regarding a former diplomat's conduct to determine whether or not that conduct would constitute an official act and qualify for residual immunity under Article 39(2).

**CONCLUSION**

For the foregoing reasons, the Court should consider whether the acts alleged by plaintiff were official acts conducted by Ambassador and Mrs. Baja "in the exercise of [their] functions as a member of the mission" in order to determine whether they enjoy any residual immunity under Article 39(2) of the VCDR.

Dated: April 28, 2009
       New York, New York

Respectfully submitted,

LEV L. DASSIN
Acting United States Attorney
Southern District of New York

By:     _____/s/_____
EMILY E. DAUGHTRY
Assistant United States Attorney
Telephone: (212) 637-1579
Fax: (212) 637-2717
E-mail: emily.daughtry@usdoj.gov