```
                                          USDS SDNY
                                          DOCUMENT
                                          ELECTRONICALLY FILED
UNITED STATES DISTRICT COURT              DOC #: _____
SOUTHERN DISTRICT OF NEW YORK             DATE FILED: 6-16-09
------------------------------------X
MARICHU SUAREZ BAOANAN,                :
                                       :
                   Plaintiff,          :    08 Civ. 5692(VM)
                                       :
       - against -                     :
                                       :    DECISION AND ORDER
LAURO LIBOON BAJA, JR., et al.,        :
                                       :
                   Defendants.         :
------------------------------------X
```

**VICTOR MARRERO, United States District Judge.**

Plaintiff Marichu Suarez Baoanan ("Baoanan") brought this action against defendants Lauro Liboon Baja, Jr. ("Baja"), Norma Castro Baja ("Mrs. Baja"), Maria Elizabeth Baja Facundo ("Facundo"), and Labaire International Travel, Inc. ("Labaire," and collectively, "Defendants"). Baja is a former diplomat, having been notified to the United States Mission to the United Nations as the Permanent Representative of the Philippines to the United Nations from May 11, 2003 to February 21, 2007. (See Defendants [sic] Reply to Plaintifff's [sic] Memorandum of Law in Support of Diplomatic Immunity, dated October 30, 2008 ("Bajas' Reply"), Ex. A ("Graham Letter").) Mrs. Baja is Baja's wife, and Facundo is their adult daughter.

Baoanan alleges that Defendants conspired to lure her from the Philippines with false promises of employment as a nurse in the United States, but once she arrived, they forced her to work as a domestic servant for Baja and Mrs. Baja (the

-1-

"Bajas") in their New York household at the Philippine Mission. In her complaint, Baoanan alleges fifteen causes of action, including claims of human trafficking, involuntary servitude, and forced labor in violation of 18 U.S.C. §§ 1589, 1590 and 1595, for which she seeks civil remedies pursuant to the Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 2002, 114 Stat. 1464 (2000).

By Order dated October 22, 2008, the Court directed the parties to submit briefs addressing whether the Court has subject matter jurisdiction over the Bajas pursuant to the Vienna Convention on Diplomatic Relations ("VCDR"), Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 98. In addition, the United States of America (the "Government") has submitted a Statement of Interest ("Statement" or "SOI") addressing whether the Court has subject matter jurisdiction over the Bajas pursuant to the VCDR.

For the reasons stated below, the Court finds that it has subject matter jurisdiction over both Baja and Mrs. Baja. Their motion to dismiss Baoanan's complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") and to quash service of process is therefore DENIED.

-2-

## I.   **BACKGROUND**

A.   BAOANAN'S ALLEGATIONS[1]

Baoanan is a graduate of Unciano Colleges and General Hospital in the Philippines, where she received a Bachelor of Science in Nursing.   Living in the Philippines, Baoanan desired to come to the United States for employment as a nurse.   In 2005, an acquaintance told Baoanan that Mrs. Baja could help Baoanan come to the United States.

In the fall of 2005, Baoanan met Mrs. Baja in Makati City, Philippines.   Mrs. Baja told Baoanan that she could arrange for her to come to the United States to work as a nurse.   Specifically, Mrs. Baja told Baoanan that in exchange for 500,000 Philippine pesos, she would (1) arrange for Baoanan's travel to the United States, (2) obtain a visa and work authorization for her, and (3) assist her in finding employment as a nurse.   Baoanan was not able to secure 500,000 pesos, but Mrs. Baja told her that 250,000 pesos would be sufficient.   By January 9, 2006, Baoanan had paid Mrs. Baja and Labaire a combined total of 250,000 pesos.[2]

---

[1] The factual allegations below are taken from the complaint, dated June 24, 2008 ("Complaint"), the well-pleaded factual allegations of which the Court "must accept as true."   Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998).   Except where specifically referenced, no further citation to this document will be made.

[2] Baoanan alleges that Labaire is a travel agency and employment agency; that Mrs. Baja was an owner, part-owner, or president; and that Facundo was a vice president.   Baoanan further alleges that Labaire facilitated Baoanan's visa application and travel arrangements to the United States at issue here.

-3-

In the second week of December 2005, Mrs. Baja had Baoanan "sign a 'contract' that [Baoanan] was not allowed to read before signing." (Complaint ¶ 20.) Next, Mrs. Baja, along with an individual named "Dorie," accompanied Baoanan to the Philippines Department of Foreign Affairs ("PDFA") to obtain a new passport for Baoanan. Mrs. Baja directed Baoanan to tell the PDFA that she was going to be Mrs. Baja's domestic worker. According to Mrs. Baja, such a statement from Baoanan would expedite the passport application process. On or about December 30, 2005, Mrs. Baja departed for the United States.

In January 2006, staff from Labaire accompanied Baoanan and Dorie to the Embassy of the United States in Manila to obtain a G-5 work visa for Baoanan. On January 11, 2006, staff from Labaire gave Baoanan her new "red" passport -- an official passport issued to members of the Philippines government and to employees of Philippine diplomatic posts abroad who are not members of the diplomatic service.[3]

Baoanan departed the Philippines for the United States on January 12, 2006. The Bajas' driver drove her directly from the airport to the Bajas' household in New York City, at the

---

[3] Baoanan alleges that hers is not an isolated incident; according to the Complaint, Mrs. Baja "sought to use her position to assist Filipinos in obtaining travel documents to countries in which ... Baja was based" and she "received a fee for these services." (Complaint ¶ 62.) Baoanan also alleges that Mrs. Baja and Labaire paid others a commission for recruiting Filipinos willing to pay a fee to travel to the United States. (Id. ¶ 63.)

-4-

Philippine Mission. Upon Baoanan's arrival, Mrs. Baja told her that she had to work for the Bajas for six months to pay off the remaining debt of 250,000 pesos that she had not paid. Mrs. Baja confiscated Baoanan's passport.

From January 13, 2006 to April 13, 2006, Baoanan served as a domestic worker for Baja, Mrs. Baja, and Facundo in the Bajas' household. During this time, Baoanan cooked, cleaned, did laundry, ironed clothes, monitored Mrs. Baja's diabetes and blood pressure, provided child care for Facundo's son, prepared for and cleaned up after the Bajas' weekly parties, and performed other general household duties. The Bajas never paid Baoanan for her services.[4]

During the time Baoanan was a domestic worker in the Bajas' household, she worked approximately 126 hours per week. The Bajas limited her meals to leftovers, forced her to sleep in the basement with only one sheet, prevented her from leaving the household unaccompanied, and verbally abused and denigrated her. Mrs. Baja and Facundo also restricted Baoanan from using the household telephone.

Baoanan alleges fifteen causes of action under various federal and state laws. As to her federal causes of action, Baoanan states claims of: (1) forced labor; (2) trafficking with respect to peonage, slavery, involuntary servitude, or

---

[4] The Complaint does allege, however, that Facundo paid Baoanan a total of $100 for the child care Baoanan provided for Facundo's son.

-5-

forced labor; (3) slavery, peonage, and involuntary servitude; (4) unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced labor; (5) violations of the Racketeer Influenced and Corrupt Organization Act; (6) violations of the Alien Tort Claims Act ("ATCA"); and (7) federal minimum wage violations. As to her state and common law causes of action, Baoanan states claims of: (1) state minimum wage violations; (2) unlawful deductions from wages; (3) state overtime violations; (4) spread of hours violations; (5) fraud; (6) negligent misrepresentation; (7) conversion; and (8) conspiracy.

The Bajas challenge Baoanan's allegations as "a total fabrication that have no evidentiary support." (Bajas' Reply 1.)  While many of the Bajas' challenges are directed at Baoanan's credibility, the Court may consider the Bajas' evidentiary submissions only to the extent that they are relevant to a determination of the Court's jurisdiction over the Bajas. (See infra Part II.A.)[5]  The Court will refer to such evidence where necessary.

B.  PROCEDURAL BACKGROUND

Baoanan filed the Complaint on June 24, 2008. Baja and Mrs. Baja were served with process in the Philippines on July 8, 2008 by Federal Express, pursuant to Federal Rule of Civil

---

[5] Whether Baoanan actually is or is not a nurse, for example, is not relevant to a determination of the Court's jurisdiction.

Procedure 4(f)(2)(c)(ii) ("Rule 4(f)"). (See Docket Nos. 2-5.) In addition, the Docket indicates that the parties entered into a stipulation on July 11, 2008 that the Bajas' attorneys "shall accept service for Lauro Liboon Baja, Jr. [and] Norma Castro Baja ... if still unserved." (See Docket No. 7 (Stipulation, dated July 11, 2008 ("July 11 Stipulation")).)

At a pre-motion conference on September 19, 2008, the Court sua sponte raised the issue of diplomatic immunity, and by written order dated September 22, 2008, the Court ordered the parties to submit briefs addressing whether the Court may exercise jurisdiction over the Bajas.[6] In their briefs, the parties focus on whether the Bajas' alleged activities fall within the "commercial activity" exception to diplomatic immunity provided in Article 31(1)(c) of the VCDR, thus providing the Court with jurisdiction. Baoanan contends that the "commercial activity" exception expressed in Article 31(1)(c) divests the Bajas of any diplomatic immunity, while the Bajas counter that the hiring of a domestic worker does not fall within the "commercial activity" exception.

By Order dated January 29, 2009, the Court invited the Government to submit a Statement of Interest in connection with this case, and the Government did so on April 28, 2009.

_____

[6] At that conference, Defendants conceded that the Court has jurisdiction over Facundo and Labaire.

-7-

In its Statement, the Government asserts that the proper vehicle for analyzing the scope of the Bajas' potential diplomatic immunity is not the "commercial activity" exception found in Article 31(1)(c) of the VCDR, but rather Article 39(2), which affords a more limited form of residual diplomatic immunity to former diplomats.

The Court invited the parties to submit their respective responses to the Statement of Interest, and each did so on May 11, 2009. The parties do not dispute the applicability of Article 39(2) to this action; however, the Bajas submit that the hiring and employment of Baoanan to work at the Philippine Mission is an act for which Baja is entitled to diplomatic immunity under Article 39(2).

## II. DISCUSSION

### A. LEGAL STANDARD

"A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000); see also Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994). "When considering a motion to dismiss for lack of subject matter jurisdiction ... a court must accept as true all material factual allegations in the complaint;" however, "jurisdiction must be shown affirmatively, and that showing is not made by drawing from

-8-

the pleadings inferences favorable to the party asserting it."
Shipping Fin. Servs., 140 F.3d at 131 (citations omitted).

While the Court must accept as true all of Baoanan's
well-pleaded factual allegations, the Court may also consider
the Bajas' proffered evidence to the extent that it supports
the Bajas' claim that the Court does not have subject matter
jurisdiction pursuant to the VCDR. See Robinson v. Government
of Malaysia, 269 F.3d 133, 140 (2d Cir. 2001) (stating that
"where evidence relevant to the jurisdictional question is
before the court, the district court ... may refer to [that]
evidence"); Filetech S.A. v. France Telecom S.A., 157 F.3d
922, 932 (2d Cir. 1998) ("Our rule is that, on a 'challeng[e]
[to] the district court's subject matter jurisdiction, the
court may resolve disputed jurisdictional fact issues by
reference to evidence outside the pleadings, such as
affidavits.'" (alterations in original) (quoting Antares
Aircraft, L.P. v. Federal Rep. of Nigeria, 948 F.2d 90, 96 (2d
Cir. 1991))).

B.    DIPLOMATIC IMMUNITY UNDER THE VCDR

The Court's first task is to determine which provision of
the VCDR, if any, applies to the Bajas' assertion of
diplomatic immunity.

Under the VCDR, a current diplomatic agent enjoys near-
absolute immunity from civil jurisdiction. See Article 31(1).

-9-

This immunity is given full effect under United States law pursuant to the Diplomatic Relations Act, which states that "[a]ny action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the [VCDR] ... shall be dismissed."   22 U.S.C. § 254d.  As the preamble to the VCDR recognizes, "the purpose of such ... immunit[y] is not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing States."  VCDR, preamble, clause 4.

There are narrow exceptions to this diplomatic immunity, which are articulated in Article 31:

A diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving State.  He shall also enjoy immunity from its civil and administrative jurisdiction, except in the case of:

(a)   A real action relating to private immovable property ...;

(b)   An action relating to succession ...;

(c)   An action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions.

VCDR Article 31(1).

Former diplomats, however, are not eligible for the immunities provided in Article 31(1); rather, they are eligible for residual diplomatic immunity, a more limited form

-10-

of immunity than that provided to current diplomats. Article 39 articulates the scope of this residual immunity:

> When the functions of a person enjoying privileges and immunities have come to an end, such privileges and immunities shall normally cease at the moment when he leaves the country, or on expiry of a reasonable period in which to do so, but shall subsist until that time, even in case of armed conflict. However, with respect to acts performed by such a person in the exercise of his functions as a member of the mission, immunity shall continue to subsist.

Article 39(2). Under this provision, a former diplomat benefits from immunity under the VCDR only for "acts performed ... in the exercise of his functions as a member of the mission." Id.

Baja was the Permanent Representative of the Philippines to the United Nations from May 11, 2003 to February 21, 2007. (See Graham Letter.) The Bajas were each served with the Complaint in the Philippines on July 8, 2008 pursuant to Rule 4(f), and the parties subsequently entered into a stipulation that the Bajas' attorneys "shall accept service for Lauro Liboon Baja, Jr. [and] Norma Castro Baja ... if still unserved." (July 11 Stipulation.) Thus, there is no dispute that the Bajas were each served with process in July 2008 in the Philippines, more than a year after Baja's diplomatic duties in the United States had ceased.

Under such circumstances, the Bajas' diplomatic immunity, if any, is determined by Article 39(2)'s provision of residual

-11-

immunity, and not the broader immunity from civil jurisdiction afforded by Article 31(1).    See Swarna v. Al-Awadi, 607 F. Supp. 2d 509, 516 (S.D.N.Y. 2009) (holding that the defendant, a former diplomat, "was served with process [after] his diplomatic duties in the United States had terminated and he had departed the country.  Thus, his immunity, if any, from the civil jurisdiction of the United States is determined by Art. 39 of the VCDR." (internal citations omitted)).[7]    The Court must therefore determine: (1) whether each defendant is eligible for residual immunity under Article 39(2); and (2) if so, whether the relevant acts alleged in the Complaint were "acts performed ... in the exercise of [the defendant's] functions as a member of the mission."    Article 39(2).    The Court addresses each defendant in turn.

C.    BAJA'S RESIDUAL IMMUNITY

As discussed above, Baja was notified to the United States Mission to the United Nations as the Permanent Representative of the Philippines to the United Nations from May 11, 2003 to February 21, 2007.  (See Graham Letter.)   He is therefore eligible for the residual immunity afforded by

---

[7]  The Government argues that it is Article 39(2), not Article 31(1), that should guide the Court's analysis. (See SOI 7 ("[B]ecause Ambassador Baja was served in this action more than a year after he left his position as Permanent Representative to the United Nations, Ambassador Baja enjoys residual immunity only for his official acts carried out as a member of the Philippine Mission to the United Nations under Article 39(2) of the VCDR.").)  As discussed below, the Court attributes significant weight to the Government's interpretation of the VCDR, and agrees with the Government's position.

Article 39(2), but only for acts he performed "in the exercise of his functions as a member of the mission." Article 39(2); see also Swarna, 607 F. Supp. 2d at 516 ("The determinative question, then, is whether the acts allegedly committed by [the former diplomat] against plaintiff were performed in the exercise of his diplomatic functions."); Brzak v. United Nations, 551 F. Supp. 2d 313, 317 (S.D.N.Y. 2008); Knab v. Republic of Georgia, No. 97CV3118, 1998 WL 34067108, at *4 (D.D.C. May 29, 1998) (holding that under Article 39(2), a former diplomat's immunity "remains intact for acts performed in the exercise of his duties as a diplomatic officer"). The Court will refer to such acts as "official acts."[8]

A leading diplomatic law expert explains that some form of residual immunity is necessary for official acts because "[t]he acts of a diplomatic agent in the exercise of his official functions are in law the acts of the sending State. It has therefore always been the case that the diplomat cannot at any time be sued in respect of such acts since this would be indirectly to implead the sending State." Eileen Denza, Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations 439 (3d ed. 2008) ("Denza, Diplomatic

---

[8] In its Statement, the Government notes that it "uses the term 'official acts' to refer only to the scope of residual immunity provided by Article 39(2) of the VCDR. The Government takes no position on the scope of the term 'official acts' as used elsewhere in the VCDR." (SOI 5 n.4.) The Court likewise limits its use of the term "official acts" to the determination of residual immunity under Article 39(2).

-13-

Law"). However, the justifications for providing near-absolute immunity to current diplomats are diminished when considering the situation of former diplomats. In Swarna, for example, the district court relied on Denza's commentary in concluding that

> residual diplomatic immunity applies to official acts --
> because such acts are attributable to the Sending State
> -- but does not apply to private acts -- because the
> purpose of immunizing a diplomatic agent's private acts
> is to ensure the efficient functioning of a diplomatic
> mission, not to benefit the private individual, and this
> purpose terminates when the individual ceases to be a
> diplomatic agent.

607 F. Supp. 2d at 517.

Also instructive on this point is the Statement of Interest filed by the Government. While the Government's interpretation of the scope of Article 39(2) is "not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. 176, 184-85, (1982); Tachiona v. United States, 386 F.3d 205, 216 (2d Cir. 2004) (citing Sumitomo in interpreting the scope of diplomatic immunity under the VCDR); see also Tabion v. Mufti, 73 F.3d 535, 538 (4th Cir. 1996) (holding that "[s]ubstantial deference is due to the State Department's conclusion" as to the scope of diplomatic immunity under the VCDR); Gonzalez Paredes v. Vila, 479 F. Supp. 2d 187, 193 (D.D.C. 2007) (same).

-14-

The Government directs the Court to the Declaration of Abraham D. Sofaer, dated July 5, 1988 ("Sofaer Decl."), submitted to the court in United States v. Guinand, 688 F. Supp. 774 (D.D.C. 1988). Quoting that declaration, the Government states:

> The United States Government has consistently interpreted Article 39 of the VCDR to permit the exercise of U.S. jurisdiction over persons whose status as members of the diplomatic mission has been terminated for acts they committed during the period in which they enjoyed privileges and immunities, except for acts performed in the exercise of the functions as a member of the mission. (Article 3 of the VCDR lists the permissible functions of a diplomatic mission.)

(SOI 6 (quoting Sofaer Decl. ¶ 5).) The reason for this constriction in diplomatic immunity is that former diplomats "are no longer exercising important functions which must be protected in order to maintain the orderly conduct of foreign relations between their state and the receiving state." (Id. (quoting Sofaer Decl. ¶ 6).)

    1.   Determining Whether an Act Is an "Official Act"

While residual immunity is available only for official acts -- that is, acts performed "in the exercise of his functions as a member of the mission," Article 39(2) -- the VCDR does not provide a definition of what constitutes such an act. The Government advises the Court to look first to Article 3 of the VCDR, "which provides a list of the 'functions of a diplomatic mission,' to inform an analysis of

-15-

whether an act was performed in the exercise of a former diplomat's 'functions as a member of the mission.'" (SOI 8-9.) Article 3 provides:

> The functions of a diplomatic mission consist, inter alia, in:
>
>> (a) Representing the sending State in the receiving State;
>>
>> (b) Protecting in the receiving State the interests of the sending State and of its nationals, within the limits permitted by international law;
>>
>> (c) Negotiating with the Government of the receiving State;
>>
>> (d) Ascertaining by all lawful means conditions and developments in the receiving State, and reporting thereon to the Government of the sending State;
>>
>> (e) Promoting friendly relations between the sending State and the receiving State, and developing their economic, cultural and scientific relations.

VCDR Article 3(1).

The Swarna Court, characterizing these as "indisputably official acts," also recognized additional acts not encompassed by Article 3 that are nonetheless properly considered to be "official": (1) acts taken "in the regular course of implementing an official program or policy of the mission," 607 F. Supp. 2d at 517 (citing De Luca v. United Nations Org., 841 F. Supp. 531, 534-35 (S.D.N.Y. 1994)); and (2) the act of "hiring and employing an individual to work at

the diplomatic mission," id. at 518 (citing Brzak, 551 F. Supp. 2d at 319; Osman v. Annan, No. 07-837-CV-W(NKL), 2008 WL 2477535, at *1-2 (W.D. Mo. June 16, 2008); D'Cruz v. Annan, 05 Civ. 8918, 2005 WL 3527153, at *1 (S.D.N.Y. Dec. 22, 2005)). However, the Swarna Court recognized that "residual diplomatic immunity does not extend to lawsuits based on actions that were entirely peripheral to the diplomatic agent's official duties." Id. (citing Guinand, 688 F. Supp. at 774; In re Application of Noboa, Nos. M18-302, M19-111, 1995 WL 581713, at *1, *3 (S.D.N.Y. Oct. 4, 1995)). Swarna summarizes the current state of the law as follows:

> [T]he case law and critical commentary point to the conclusions that the residual diplomatic immunity provided by Art. 39 is a functional immunity that applies to a former diplomatic agent's official acts but not private acts; that official acts include acts directly related to the "functions of a diplomatic mission" listed in Art. 3, as well as acts related to the employment of subordinates at the diplomatic mission; and that official acts do not include acts that were completely peripheral to the official's diplomatic duties.

Id. at 519.   The Government "agrees with the analytical approach of the Swarna court, which came to its determination by considering, 'whether the acts allegedly committed by [defendant] against plaintiff were performed in the exercise of his diplomatic functions.'" (SOI 10 (quoting Swarna, 607 F. Supp. 2d at 516).)

The Court concurs with the functional approach adopted in Swarna: acts allegedly committed by Baja that were performed

-17-

in furtherance of his diplomatic functions such that they are "in law the acts of the sending State" (Denza, Diplomatic Law 439) are official acts; all other acts are private acts for which residual immunity is not available.[9]

    2.   Application to Baja

    Baoanan's claims fall into two categories.  The first set of claims, based in employment and labor law, addresses Baja's alleged violations of obligations and expectations that arose out of Baoanan's employment as a domestic worker in the Bajas' household (the "Employment Claims").  These include: federal minimum wage violations (Complaint ¶¶ 141-144); state minimum wage violations (id. ¶¶ 145-148); unlawful deductions from

---

[9]  The Court notes that the determination of whether an act constitutes an "official act" under Article 39(2) is entirely independent from the determination of whether an act constitutes a commercial activity conducted outside of the diplomat's official function under Article 31(1)(c).  In Sabbithi v. Al Saleh, 605 F. Supp. 2d 122 (D.D.C. 2009), the court concluded that the defendants were immune from suit pursuant to the "commercial activity" exception of Article 31(1)(c), but also stated that the defendants enjoyed residual immunity under Article 39(2) because "[a]s the Court previously concluded, defendants' conduct in employing plaintiffs was not performed outside the exercise of defendants' diplomatic functions."  Id. at 130 (citing internally to the court's discussion of the "commercial activity" exception).  The Government encourages the Court to reject this analytical framework because there are types of unofficial conduct that are "incidental to the life of a diplomat and therefore protected by the broad immunity provided under Article 31, that would appear to fall outside the scope of the official acts 'imputable to the sending State' for which Article 39(2) provides residual immunity."  (SOI 13.)  The Swarna Court rejected such a conflation, stating that Article 39(2) employs "more restrictive language" than Article 31(1)(c), and concluding that not all non-commercial acts of a diplomatic agent are per se official acts.  607 F. Supp. 2d at 521.  The Court agrees with the Government's position and finds that even if a diplomatic agent's conduct is determined to fall outside the "commercial activity" exception of Article 31(1)(c), the Court must conduct a separate and independent analysis regarding a former diplomat's acts to determine whether those acts constitute "official acts" entitling him to residual immunity under Article 39(2).  (See SOI 13-14.)

                              -18-

wages (id. ¶¶ 149-152); state overtime violations (id. ¶¶ 153-156); spread of hours violations (id. ¶¶ 157-159); fraud (id. ¶¶ 160-167); negligent misrepresentation (id. ¶¶ 168-173); conversion (id. ¶¶ 174-175); and conspiracy (id. ¶¶ 176-179).

The second set of claims does not address issues that arose directly out of Baoanan's provision of services to the Bajas as a domestic worker, but rather Baja's alleged actions undertaken to induce Baoanan to travel from the Philippines to the United States (the "Non-Employment Claims"). These include: forced labor (id. ¶¶ 65-74); trafficking with respect to peonage, slavery, involuntary servitude, or forced labor (id. ¶¶ 75-80); slavery, peonage, and involuntary servitude (id. ¶¶ 81-86); unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced labor (id. ¶¶ 87-93); violation of the Racketeer Influenced and Corrupt Organization Act, alleging predicate acts of peonage, involuntary servitude, forced labor trafficking, unlawful conduct with respect to documents, extortion, larceny by extortion, and kidnapping (id. ¶¶ 94-136); and violation of the ATCA (id. ¶¶ 137-140).

As these two sets of claims implicate different issues with regard to whether Baja's alleged acts were official or private, the Court addresses each set separately. See Swarna,

607 F. Supp. 2d at 519-21 (separately analyzing residual immunity as applied to labor law and ATCA claims).

    a.   Employment Claims

    Baja argues that his employment of Baoanan was an "official act" under Article 39(2) and that he is thus entitled to residual diplomatic immunity.  He first contends that the mere act of hiring a domestic worker is an "official act" that is done "to ensure efficient performance of the diplomatic functions of diplomatic missions or acts performed on behalf of or imputable to [the] sending State."  (Bajas' letter to Honorable Judge Marrero, dated May 11, 2009 ("Bajas' Letter"), 2.)

    The Court rejects Baja's suggestion that a diplomatic agent's employment of a domestic worker is always an official act encapsulated by Article 39(2).  Such employment, without more, is not inherently an "act[] performed ... in the exercise of his functions as a member of the mission," Article 39(2), nor is it inherently related to any of the "functions of a diplomatic mission" provided in Article 3(a)-(e).  While Baja encourages the Court to recognize that the "act of hiring housemaids and bringing them into the territory of receiving states has been a long engrained practice" utilized by almost every diplomat in the United States today, the Court rejects such a wholesale approach to determining

-20-

immunity to civil suits brought by domestic workers. (Bajas'
Letter 2.) Functionally, not all domestic workers hired by
diplomats are necessarily alike. While undoubtedly many are
routinely employed and assigned to provide services related
solely to the official functions of the mission, it does not
follow that all such workers are always hired only for such
purposes. A diplomat could also employ and pay staff to
perform personal or private tasks for the diplomat or the
diplomat's family that the sending State would not recognize
as ordinary or necessary to the official functioning of the
mission and for which it would not provide compensation. As
the Swarna Court recognized, "[t]he guiding question is
whether the act of employment was official or private." 607
F. Supp. 2d at 520.[10] Indeed, the Swarna Court determined that
a former diplomatic agent's employment of a domestic worker
was a "private" act and not an "official" one. Id. The Court
will therefore examine  the circumstances surrounding Baja's
alleged acts to determine whether his employment of Baoanan
was official or private, rather than declaring that, as a

---

[10]   Baja's reliance on Tabion for this point is misplaced. (See Bajas'
Letter 2.) The court there stated that "[d]ay-to-day living services such
as ... domestic help were not meant to be treated as outside a diplomat's
official functions. Because these services are incidental to daily life,
diplomats are to be immune from disputes arising out of them." Tabion, 73
F.3d at 538-39. However, the defendant in Tabion was a current diplomat,
not a former diplomat; the court therefore analyzed the defendant's
immunity pursuant to Article 31(1)(c), not Article 39(2). As explained
above, see supra n. 9, whether an act falls into the "commercial activity"
exception in Article 31(1)(c) has no bearing on the determination of
whether the act is an "official act" under Article 39(2). See also
Swarna, 607 F. Supp. 2d at 520 n.12.

general rule, employment of a domestic worker by a diplomatic agent is categorically an official act that should be imputed to the sending State.

Baja next argues that the circumstances in this case establish that his employment of Baoanan was official and not private, thus distinguishing the case from <u>Swarna</u>. A brief summary of <u>Swarna</u> is therefore appropriate.

In <u>Swarna</u>, the plaintiff brought an action against her former employers, including Badar Al-Awadi ("Al-Awadi"), who, at the time of the events in question, was serving in New York City with the Permanent Mission of the State of Kuwait to the United Nations. <u>See</u> 607 F. Supp. 2d at 511-13. The plaintiff agreed to work in the United States in the home of Al-Awadi and his wife in exchange for $2,000 per month and specified vacation time. To secure a G-5 visa for the plaintiff, Al-Awadi informed an official at the United States Embassy in Kuwait that the plaintiff would be given a contract of employment (though she ultimately was not given such a contract). When the plaintiff arrived in the United States, Al-Awadi confiscated her passport and visa. The plaintiff lived and worked as a domestic live-in servant to Al-Awadi and his wife in their home, located about a mile from the United Nations and the Kuwait Mission. She was forced to work seventeen hours per day, seven days per week. Her duties

included caring for the Al-Awadis' two children, doing
laundry, ironing, cleaning the home, cooking for the family,
and cooking for and serving guests who visited the home "in
honor of employees of the Kuwait Mission." Id. at 513. The
plaintiff was paid $200 to $300 per month. She was prohibited
from using her promised vacation time, from leaving the
apartment unsupervised, and from using the telephone or
sending mail to her relatives in India. Finally, she was
repeatedly assaulted and abused by Al-Awadi and his wife, both
physically and psychologically.

    The plaintiff's claims against Al-Awadi included slavery
and slavery-like practices in violation of the ATCA, and New
York labor law violations. The court first addressed the
labor law claims, stating that while the claims were
employment-related, Al-Awadi's employment of the plaintiff was
not an "official act" because: (1) the employment bore no
relationship to the functions of a diplomatic mission listed
in Article 3; (2) the plaintiff was not employed in the course
of implementing an official policy or program of the Kuwait
Mission; and (3) the plaintiff was not a subordinate of Al-
Awadi, whom he hired to work at the Kuwait Mission. Id. at
520. The court concluded that the plaintiff was Al-Awadi's
"domestic servant, hired to work in his private home, tending
to his family's personal affair[s]." Id. While the court

acknowledged that the Kuwait Mission received tangential benefits on the occasions when Al-Awadi entertained members of the mission at his home, this did not make the plaintiff "an employee of the mission, and did not make Mr. Al-Awadi's act of employing her 'in law the act[] of the sending State.'" Id. (quoting Denza, Diplomatic Law 439).

As to the plaintiff's ATCA claims, the court held that such alleged acts "were private acts, not official acts" because they "were entirely peripheral to Mr. Al-Awadi's official duties as a diplomatic agent." Id. at 521. The court concluded that Al-Awadi did not have residual diplomatic immunity from the plaintiff's labor law claims nor her ATCA claims, and granted her motion for a default judgment against Al-Awadi.

The similarities between Swarna and the present action are striking. Baja seeks to distinguish the two cases on the following grounds: (1) Baja sought and received permission from the Philippine government for Baoanan's services as a domestic worker by filing an application with the PDFA for Baoanan's red passport; (2) Baoanan's services were "officially" recognized by the United States Mission when Baoanan presented herself to the United States Embassy in the Philippines to obtain her G-5 visa; (3) all of the contracted services and alleged acts happened entirely inside the

-24-

premises of the Philippine Mission, and Baoanan was the only domestic worker working in the Philippine Mission during her stay; and (4) one of Baoanan's duties was to clean up after diplomatic parties held by Mrs. Baja at the Philippine Mission, which is an official act under Article 3(e) of the VCDR.  (Bajas' Letter 2-3.)  Baja concludes that because "a diplomatic agent's act of hiring and employing an individual to work at the diplomatic mission is an official act, and that disputes arising out of such employment are barred by Art. 39's residual diplomatic immunity," Swarna, 607 F. Supp. 2d at 518, and because Baoanan was hired and employed to work at the Philippine Mission, Baja enjoys residual diplomatic immunity from claims arising out of that employment.  (Bajas' Letter 3.)

First, Baja's employment of Baoanan as a domestic worker is not transformed into an "official act" merely because the PDFA granted his application to issue her a red passport and she obtained a G-5 visa from the United States Embassy in the Philippines.  To the contrary, the very documents submitted to the Court by Baja describe the employment of a domestic worker to be a private act of employment to satisfy the personal needs of the diplomatic agent and his family.  For example, the PDFA's guidelines for issuing a red passport, which Baja describes as "the form and substance for Philippine government

-25-

approval for a diplomat to hire and take a domestic helper to
a foreign post" (Bajas' Reply 5), provide "information and
guidance [to] Foreign Service personnel who wish to bring
<u>private</u> <u>staff</u> to their posts of assignment." (Bajas' Letter
Ex. H (SUBJECT: Requirements for Bringing Private Staff to
Foreign Service Posts) (emphasis added).) The form Affidavit
of Undertaking accompanying the regulations stipulates that
the employment of an individual "as my private staff is ...
for the sole purpose of meeting my <u>personal</u> <u>household</u> <u>needs</u> at
the Post." (<u>Id.</u> Ex. H (Affidavit of Undertaking) ¶ 7
(emphasis added).)[11] Likewise, the Government's regulations
regarding G-5 visas state that the recipient of such a visa
may be "an attendant or <u>personal</u> <u>employee</u> of an official or
other employee of a diplomatic or consular mission or
international organization." (<u>Id.</u> Ex. F (A Message from the
Government of the United States of America) (emphasis
added).)[12] Taken together, these documents support the
conclusion that the employment of a domestic worker by a

---

[11]    While the parties have not submitted a copy of the Affidavit of
Undertaking signed by Baja, the Court understands that this form must be
completed in order for a domestic worker to obtain a red passport. In
addition, Baja's statement that he "sought and got permission of the
Philippine government" suggests that he submitted an Affidavit of
Undertaking. Finally, the mere presence of such language on the blank
form indicates that the PDFA does not consider the issuance of a red
passport, without more, to function as an endorsement of that employment
as an act related to a diplomatic agent's exercise of his official duties.

[12]  Notably, in <u>Swarna</u>, Al-Awadi received approval from the United States
Embassy in Kuwait for the plaintiff's G-5 visa, yet the court nonetheless
determined her employment to be a private act. <u>See</u> 607 F. Supp. 2d at
513.

diplomatic agent predominantly for the purpose of meeting his own and his family's personal domestic needs is not an act performed "in the exercise of his functions as a member of the mission."   Article 39(2).   While such employment is permissible, the documents take great care to specify that it is a "private" and "personal" employment relationship.

By all accounts, Baoanan was employed by Baja to perform private, domestic services.  Her Contract of Employment states that she was hired "as a domestic helper to perform the following duties for [Baja] and his[] family: a. cook[;] b. clean the house[;] [and] c. take care of laundry." (Bajas' Reply Ex. E (Contract of Employment).)  Baoanan alleges that she also monitored Mrs. Baja's diabetes and blood pressure, provided child care for Facundo's son, and performed other general household duties.  (See Complaint ¶ 36.)  These duties were performed for the sole benefit of fulfilling the Baja family's personal household needs, and are unrelated to Baja's diplomatic functions as a member of the mission.

Nor does Baoanan's allegation that she prepared for and cleaned up after the Bajas' weekly parties at the Philippine Mission (id.) transform her employment into an official act. While Baja characterizes these parties as "diplomatic parties" (Baja Letter at 3), this "tangential benefit to the [Philippine] Mission did not make her an employee of the

-27-

mission." Swarna, 607 F. Supp. 2d at 520.  Although the
parties may have had diplomatic associations, there is no
indication that Baja's assignment of a private domestic worker
to clean up after those parties is demanded by his diplomatic
functions.  Conceivably, he could just as well have assigned
that task to some regular employee of the mission.  Viewing
Baoanan's duties in their entirety, the Court sees no
meaningful difference between Baoanan's services and those
provided by the plaintiff in Swarna, where subject matter
jurisdiction was found to be proper.

Baja's last distinction between this case and Swarna
warrants deeper discussion.  In Swarna, the plaintiff was
employed in Al-Awardi's private residence one mile away from
the Kuwait Mission.  The court interpreted a line of cases to
hold that "residual diplomatic immunity applies to employment-
related disputes concern[ing] lawsuits brought by individuals
who were or had been employed at the actual diplomatic mission
(or the U.N.) where the former diplomat had been employed."
Id. at 519 (emphasis added).  The court concluded that the
plaintiff's employment outside of the actual Kuwait Mission
was meaningful in rendering her employment a private act.

Baja contends that he and his family resided in the
Philippine Mission itself, and that "all of the contracted
services and all the acts complained of in the causes of

-28-

action happened entirely inside the premises of the Philippine [M]ission." (Bajas' Letter 2.)  Baja concludes that because Baoanan was hired to work in the diplomatic mission, it is an official act warranting residual immunity.  See Swarna, 607 F. Supp. 2d at 518 (stating that other courts have held that "a diplomatic agent's act of hiring and employing an individual to work at the diplomatic mission is an official act").

However, to hold categorically that it is always an official act to employ an individual who works within the four walls of a diplomatic mission -- even when, at the time it was contracted for and during the course of the performance of its duties, the nature of that employment is entirely unrelated to the diplomatic agent's functions as a member of the mission -- would improperly reward form over substance.  Physical location should be considered in determining whether an act is official or private, but certainly it is not by itself dispositive.  In this case, Baoanan's employment was personal to Baja, pertaining predominantly to the private needs of the Baja family and their domestic affairs, inuring to the Bajas' personal comfort and only tangentially to the benefit of the Philippine Mission itself.  To deem these activities as having occurred in the course of Baja's official functions would result in a perverse outcome: a diplomatic agent whose official residence happens to be located within the same

-29-

building as the mission would be immune from jurisdiction for acts stemming from his employment of a domestic worker, while a diplomatic agent who resides in a separate building adjoining or nearby his mission and employs a domestic worker to perform identical duties in an identical fashion, would not qualify for such immunity.  Indeed, the Bajas do not dispute that Baoanan's duties would have been identical no matter where the Bajas resided during the course of Baja's diplomatic service at the mission.  In other words, employment of a domestic worker whose duties are limited to fulfilling the personal household needs of a diplomat and his family is a private act that is not "performed on behalf of or immutable to the sending State" (Denza, Diplomatic Law 441), even when the provision of those services for the diplomat happens to occur inside the premises that house the diplomatic mission.

While Swarna recognizes that other courts have held that "a diplomatic agent's act of hiring and employing an individual to work at the diplomatic mission is an official act," 607 F. Supp. 2d at 518, the Court is persuaded that the scope of those cases is more limited by all relevant circumstances than Swarna suggests.  In Brzak, the plaintiff, a human resources assistant, was employed "by the Office of the U.N. High Commissioner for Refugees."  551 F. Supp. 2d at 315; No. 06 Civ. 3432, Docket No. 1 (Complaint).  In Osman,

-30-

the plaintiff, a contracts management officer, "was employed by the U.N. Mission in the Democratic Republic of Congo." 2008 WL 2477535, at *1.   And in D'Cruz and De Luca, the plaintiffs, an accounts assistant and a U.N. security guard respectively, were each employed by the United Nations.   See D'Cruz, 2005 WL 3527153, at *1; No. 05 Civ. 8918, Docket No. 1 (Complaint); De Luca, 841 F. Supp. at 532.   In each of these cases, the plaintiff (1) was employed by a United Nations entity, and (2) provided services to benefit that entity. Here, Baoanan was not employed by the Philippine Mission but by Baja personally.   (See Bajas' Reply Ex. E (Contract of Employment "entered into by and between Amb. Lauro Baja ... and Marichu Baoanan").)   In addition, Baoanan's services did not benefit the Philippine Mission itself, except tangentially, but rather inured predominantly to the Bajas' private needs.

While Brzak, Osman, D'Cruz and De Luca may support the conclusion that a diplomatic agent's act of hiring and employing an individual to work at a diplomatic mission in support of the diplomatic agent's exercise of his diplomatic functions is an official act, they do not support such a conclusion when the employment at issue is not solely for the purpose of supporting the diplomatic agent's exercise of his diplomatic functions.   To hold otherwise would violate Article

39(2), which provides immunity only for "acts performed ... in the exercise of [a diplomat's] functions as a member of the mission."

Based on the above analysis, the Court holds that Baja's employment of Baoanan as a domestic worker in his residence at the Philippine Mission was a private act for which Baja cannot avail himself of residual immunity pursuant to Article 39(2). By extension, Baja is not immune from civil jurisdiction for the alleged acts underlying the Employment Claims, such as minimum wage and overtime violations.

b.   Non-Employment Claims

The Non-Employment Claims, including claims of human trafficking, involuntary servitude, and forced labor, involve allegations of acts that were "entirely peripheral to [Baja's] official duties as a diplomatic agent." Swarna, 607 F. Supp. 2d at 521; see also id. (holding that "alleged acts of trafficking, involuntary servitude, enslavement, forced labor, rape and sexual slavery were private acts, not official acts" (citing Guinand, 688 F. Supp. at 776-77)).

As discussed at length above, Baja may enjoy residual immunity only as to his "official acts." Because there is no basis for concluding that any of the activities underlying the Non-Employment Claims, if true, were performed "in the exercise of [Baja's] functions as a member of the mission,"

-32-

Article 39(2), or that they were "performed on behalf of or
imputable to the sending State" (Denza, Diplomatic Law 441),
such acts are private acts for which Baja cannot enjoy
residual immunity.  The Court therefore has subject matter
jurisdiction over Baja as to these claims.

D.    MRS. BAJA'S RESIDUAL IMMUNITY

There is no indication that Mrs. Baja was ever a member
of the Philippine Mission to the United Nations.  As the
Government points out, because Mrs. Baja was served with
process after Baja left his post and because "she was never a
member of the Philippine Mission to the United nations, ...
Mrs. Baja enjoys no residual immunity and is subject to the
civil jurisdiction of the United States." (SOI 7.)  The Court
agrees.  Because Mrs. Baja did not conduct any acts "as a
member of the mission" as required under Article 39(2)
(emphasis added), she is not eligible in her own right for
residual immunity.

Nor is Mrs. Baja eligible for residual immunity as the
spouse of a former diplomat.  Article 37(1) of the VCDR states
that "members of the family of a diplomatic agent forming part
of his household shall, if they are not nationals of the
receiving State, enjoy the privileges and immunities specified
in articles 29 to 36."  However, because residual immunity is
provided in Article 39, it is outside the scope of protections

-33-

available to family members pursuant to Article 37(1).  Mrs. Baja is therefore ineligible for residual diplomatic immunity and her motion to dismiss the complaint pursuant to Rule 12(b)(1) is denied.[13]

The Court is mindful that this litigation may present inconvenience for the Bajas.  (See Baja Letter 3.)  At this stage, however, it is not for the Court to decide whether another more convenient forum may exist in the Philippines. The sole issue before the Court is whether it may exercise subject matter jurisdiction over the Bajas with regard to Baoanan's allegations.  See Well-Made Toy Mfg. Corp. v. Lotus Onda Indus. Co., Ltd., No. 02 Civ. 1151, 2003 WL 42001, at *11 (S.D.N.Y. Jan. 6, 2003) ("Pursuant to its inquiry into whether it has subject matter jurisdiction, this court ought not to consider whether it is 'advisable, convenient or wise' for this court to hear such claims." (quoting Armstrong v. Virgin Records, Ltd., 91 F. Supp. 2d 628, 637 (S.D.N.Y. 2000))).

---

[13]  The Court is aware that the Swarna Court stated it was unclear whether the spouse of a former diplomat could avail herself of the protection of residual immunity under Article 39(2).  See 607 F. Supp. 2d at 522 (stating that while residual immunity is outside the scope of Article 37(1), "it is unclear whether she performed any 'functions' within the meaning of Art. 39").  However, the Swarna Court did not have the benefit of a Statement of Interest from the Government on the issue.  Here, the Government argues that, as the spouse of a former diplomat, Mrs. Baja's "immunity does not continue to subsist for any acts.  Thus, Mrs. Baja enjoys no residual immunity and is subject to the civil jurisdiction of the United States." (SOI 7.)  As noted above, "the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." Sumitomo, 457 U.S. at 184-85.  The Court agrees with the Government's conclusion that a former diplomat's spouse who was not, in her own right, a member of a mission cannot avail herself of the residual immunity provided by Article 39(2).

Having found such jurisdiction to be proper, the Court makes no findings as to the ultimate merits of Baoanan's allegations.

### III.  ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the motion (Docket No. 9) of defendants Lauro Liboon Baja, Jr. and Norma Castro Baja to dismiss the complaint and quash service of process for lack of subject matter jurisdiction is DENIED; and it is further

**ORDERED** that a conference with the Court is scheduled for July 10, 2009 at 2:45 p.m. to discuss case management of the action.


**SO ORDERED.**

Dated:    New York, New York
          16 June 2009

                                    VICTOR MARRERO
                                      U.S.D.J.

-35-